Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEEL ASHRAF, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MINISO GROUP HOLDING LIMITED, GUOFE YE, SAIYIN ZHANG, MINXIN LI, DONALD J. PUGLISI, GOLDMAN SACHS (ASIA) L.L.C., BOFA SECURITIES, INC., and PUGLISI & ASSOCIATES,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Plaintiff Adeel Ashraf ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements, public filings, wire and press releases published by and regarding MINISO Group Holding Limited ("MINISO" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded MINISO securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with MINISO's October 2020 initial public offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.      On October 15, 2020, Defendants held the IPO, issuing approximately 30,400,000 American Depositary Shares ("ADSs") to the investing public at $20.00 per ADS, pursuant to the Registration Statement.

3.      By the commencement of this action, the Company's ADSs trade significantly below the IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.      The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

1

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v(a)).

6.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District. Further, MINISO stated in its Registration Statement that: "Most of subsidiaries [sic] in United States are operated in the state of California, and thus they will be subject to state income tax rate of 8.84%."

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of MINISO securities in this District.

## **PARTIES**

9.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

10.     Defendant MINISO purports to be a fast-growing global value retailer which serves consumers primarily through its large network of MINISO stores.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

11.    The Company is incorporated in the Cayman Islands and its head office is located at 25F, Heye Plaza, No.486, Kangwang Middle Road, Liwan District, Guangzhou 510140, Guangdong Province, People's Republic of China ("PRC"). MINISO's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MNSO."

12.    Defendant Guofe Ye ("Ye") was at the time of the IPO the Company's Chief Executive Officer and Chairman of the Board of Directors. Defendant Ye reviewed, contributed to, and signed or caused to be signed the Registration Statement.

13.    Defendant Saiyin Zhang ("Zhang") was at the time of the IPO the Company's Chief Financial Officer and a Director. Defendant Zhang reviewed, contributed to, and signed or caused to be signed the Registration Statement.

14.    Defendant Minxin Li ("Li") was at the time of the IPO a Director of the Company. Defendant Li reviewed, contributed to, and signed or caused to be signed the Registration Statement.

15.    Defendant Donald J. Puglisi ("Puglisi") was at the time of the IPO MINISO's duly authorized representative in the United States. Defendant Puglisi signed the false and misleading Registration Statement on his own behalf and on behalf of Defendant Puglisi & Associates, Defendant Puglisi's employer.

16.    Defendants Ye, Zhang, Li, and Puglisi are sometimes referred to herein as the "Individual Defendants."

17.    Each of the Individual Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential

3

MINISO investors, all motivated by their own and the Company's financial interests.

18.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm which acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Goldman Sach's address is 68th Floor, Cheung Kong Center, 2 Queen's Road, Central, Hong Kong, Special Administrative Region of the PRC.

19.     Defendant BofA Securities, Inc. ("BofA") is an investment banking firm which acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BofA's address is One Bryant Park, New York, NY 10036.

20.     Defendants Goldman Sachs and BofA are referred to herein as the "Underwriter Defendants."

21.      Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees from the IPO collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from the Company, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also obtained an agreement from the Company and the Individual Defendants that MINISO would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(c)     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, and current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management, and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company's would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the Company's existing problems as detailed herein.

22.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

23.     Defendant Puglisi & Associates was MINISO's authorized U.S. representative for purposes of the IPO. Defendant Puglisi, who signed the Registration Statement, was an employee of Defendant Puglisi & Associates. As a result, Defendant Puglisi & Associates is liable for the securities law violations committed by Defendant Puglisi in its capacity as employer and as a control person under the Securities Act.

24.     The Company, the Individual Defendants, the Underwriter Defendants, and Puglisi & Associates are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

## MINISO's False and/or Misleading Registration Statement

25.     On September 23, 2020, MINISO filed with the SEC a registration statement on Form F-1, which in combination with its subsequent amendments on Forms F-1/A, and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.

26.     On October 15, 2020, MINISO filed with the SEC the final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, MINISO sold 30,400,000 ADSs at $20.00 per ADS.

27.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

28.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

29.    Throughout the Registration Statement, MINISO stressed its purported business as an asset-light franchise model, its planned use of its IPO funds, and its fast-growth.

30.    MINISO neglected to raise the ongoing state and model of its business, its stores, its planned use of funds, and concerns thereof.

31.    The Registration Statement stated the following, in pertinent part, regarding the Company's ownership and control of stores as well as its business model and fast-growth:

> … As of June 30, 2020, we served consumers primarily through **our network of over 4,200 MINISO stores, of which we directly operated 129**, including over 2,500 MINISO stores in China and over 1,680 MINISO stores across over 80 countries and regions in the rest of the world.
>
> *          *          *
>
> Our path to success in our home market, China, depends on the effectiveness and scalability of our MINISO Retail Partner model. ***Under this innovative model, MINISO Retail Partners mobilize their resources to open and operate MINISO stores at optimal locations and shoulder the associated capital expenditure and operating expenses, while we let them use our brand and provide them with valuable guidance on key aspects of store operation in exchange for a pre-agreed portion of in-store sales proceeds.*** The MINISO Retail Partners keep the remaining sales proceeds and we retain inventory ownership until in-store sale to consumers. ***The MINISO Retail Partner model aligns the interests and creates mutual benefits between us and the MINISO Retail Partners, where we achieve rapid store network expansion with consistent brand image and consumer experience in an asset-light manner, and our MINISO Retail Partners attain attractive investment returns.*** … Our MINISO Retail Partners are also motivated to maintain a loyal relationship with us. As of June 30, 2020, 488 of our 742 MINISO Retail Partners had invested in MINISO stores for over 3 years.
>
> *          *          *
>
> … ***We accomplished such international store expansion under flexible models tailored to local conditions, including direct***

7

*operation, the MINISO Retail Partner model, and partnership with local distributors.* …

\* \* \*

**Our Strengths**

We believe that the following competitive strengths contribute to our success and set us apart from our competitors:

• *fast-growing* global value retailer offering design-led lifestyle products; …

• *highly effective and scalable MINISO Retail Partner model*;

• globalization capabilities fueling expansion at scale[.]

\* \* \*

**Key Operating Data**

We regularly review the following key operating data to evaluate our business, measure our performance, identify trends, formulate financial projections and make strategic decisions.

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 30, 2018 | December 31, 2018 | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 |
| **Number of MINISO stores** | | | | | | | | |
| **China** | **2,159** | **2,254** | **2,273** | **2,311** | **2,384** | **2,543** | **2,535** | **2,533** |
| —Directly operated stores | 2 | 2 | 5 | 9 | 11 | 8 | 8 | 7 |
| —Third-party stores(2) | 2,157 | 2,252 | 2,268 | 2,302 | 2,373 | 2,535 | 2,527 | 2,526 |
| **Overseas(1)** | **1,019** | **1,205** | **1,280** | **1,414** | **1,529** | **1,668** | **1,688** | **1,689** |
| —Directly operated stores | 58 | 68 | 71 | 74 | 79 | 126 | 122 | 122 |
| —Third-party stores(2) | 961 | 1,137 | 1,209 | 1,340 | 1,450 | 1,542 | 1,566 | 1,567 |
| **Total** | **3,178** | **3,459** | **3,553** | **3,725** | **3,913** | **4,211** | **4,223** | **4,222** |

Notes:
(1)   Overseas stores exclude a small number of stores under certain overseas businesses that we had disposed of as of June 30, 2020. We completed such business disposal during the period from December 2019 to April 2020. See "Management's Discuss and Analysis of Financial Condition and Results of Operations—Discontinued Operations." After the disposal, these excluded stores may continue to have business transactions with us.
(2)   Third-party stores include those operated under the MINISO Retail Partner model and those under the distributor model.

As of September 30, 2020, there were (i) 2,633 MINISO stores in China, all of which had resumed operation after a period impacted by COVID-19, and (ii) 1,697 MINISO stores in overseas markets, 1,516 of which had resumed operation after a period impacted by COVID-19. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of COVID-19" and "Risk Factors—Risks Related to Our Business and Industry—Our operations have been and may continue to be affected by COVID-19 pandemic" for more information on the impact of COVID-19 on our store network expansion.

\* \* \*

*Store Network Expansion in China*

*Our ability to expand our store network, especially in China, is a key driver of our revenue growth.* … *Outside of seven MINISO stores directly operated by us, substantially all of the MINISO stores were operated under the MINISO Retail Partner model in China as of June 30, 2020.* Our store network expansion in China is primarily sustained by our continued success in enticing them to open more MINISO stores at optimal locations. As a result, the number of MINISO stores in China increased from 2,311 as of June 30, 2019 to 2,533 as of June 30, 2020. …

Our mutually beneficial and long-lasting relationships with MINISO Retail Partners are largely attributable to our powerful brand, easy-to-operate model and attractive returns. Our innovative MINISO Retail

8

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Partner model allows the MINISO Retail Partners to rely on the strength of our "MINISO" brand and receive substantial store management guidance from us, while reaping sizeable financial reward from product sales. Based on a survey conducted by Frost & Sullivan, MINISO Retail Partners generally recover their store investment in a period of 12 to 15 months after store opening. They are thus incentivized to re-invest their capital with us and to mobilize resources to expand our store network.

\*      \*      \*

### Our Strengths

We believe that the following competitive strengths contribute to our success and set us apart from our competitors:

*Fast-growing Global Value Retailer Offering Design-led Lifestyle Products*
**We are a fast-growing** global value retailer of lifestyle products as evidenced by the speed of expansion of our store network globally. We opened our first store in China in 2013, and we had become a globally proven retail concept with more than 4,200 stores worldwide as of June 30, 2020, including over 2,500 stores in over 300 cities across China and over 1,680 stores across over 80 countries and regions throughout the rest of the world. …

*Highly Effective and Scalable MINISO Retail Partner Model*
**We employ our innovative MINISO Retail Partner model extensively in China as well as in certain overseas markets, such as Indonesia, to facilitate store network expansion.** Our MINISO Retail Partner model disrupts the status quo of the traditional store operation models, **allowing us to quickly and effectively expand our store network in an asset-light manner while maintaining consistent brand image and consumer experience across MINISO stores**.

Under the MINISO Retail Partner model, MINISO Retail Partners join our store network by mobilizing their resources to open and operate MINISO stores at optimal locations, shouldering the associated capital expenditure and operating expenses. On the other hand, we guide the MINISO Retail Partners in key aspects of store operation while maintaining ownership of store inventory before it gets sold to consumers in exchange for a pre-agreed portion of sales proceeds. This model creates an attractive investment opportunity with robust cash

9

flows for our MINISO Retail Partners. … As of June 30, 2020, 488 out of our total 742 MINISO Retail Partners had invested in MINISO stores for over 3 years.

*      *      *

***Expand and Upgrade Our Store Network***

We believe there is still huge potential for market expansion in China, and we plan to further expand our store network in China. ***We intend to take a disciplined approach in store network expansion to capture opportunities in lower-tiered cities in China and further penetrate the cities we have covered.*** In addition, we plan to add more MINISO stores of a bigger size in the future, which tend to have a larger product selection and lead to a better shopping experience, and we will also capitalize on locations with proven consumer traffic and high sales potential.

In overseas markets, we plan to actively identify and collaborate with the right business partners and local distributors to open more MINISO stores. … Moreover, we will continue to develop and more deeply penetrate strategic markets, most notably North America and India.

*      *      *

**Our Store Network**

As of June 30, 2020, our store network consisted of over 4,200 MINISO stores across the globe, with more than 2,500 MINISO stores in over 300 cities across China and more than 1,680 MINISO stores across over 80 counties and regions mainly in the rest of Asia, Americas and Europe. MINISO stores constituted the world's most extensive retail network for variety lifestyle products in terms of countries and regions covered as of June 30, 2020, according to the Frost & Sullivan Report. In addition to the MINISO stores dedicated to selling products under our MINISO brand, our store network also includes stores for our emerging brand, WonderLife. The following table shows the number of MINISO stores in China and internationally:

| | As of | | | | | | | |
| | September 30, 2018 | December 31, 2018 | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 |
|---|---|---|---|---|---|---|---|---|
| **Number of MINISO stores** | | | | | | | | |
| China | 2,159 | 2,254 | 2,273 | 2,311 | 2,384 | 2,543 | 2,535 | 2,533 |
| —Directly operated stores | 2 | 2 | 5 | 9 | 11 | 8 | 8 | 7 |
| —Third-party stores(2) | 2,157 | 2,252 | 2,268 | 2,302 | 2,373 | 2,535 | 2,527 | 2,526 |
| Overseas(1) | 1,019 | 1,205 | 1,280 | 1,414 | 1,529 | 1,668 | 1,688 | 1,689 |
| —Directly operated stores | 58 | 68 | 71 | 74 | 79 | 126 | 122 | 122 |
| —Third-party stores(2) | 961 | 1,137 | 1,209 | 1,340 | 1,450 | 1,542 | 1,566 | 1,567 |
| **Total** | 3,178 | 3,459 | 3,553 | 3,725 | 3,913 | 4,211 | 4,223 | 4,222 |

*      *      *

10

CLASS ACTION COMPLAINT FOR VIOLATIONS OF<br>THE FEDERAL SECURITIES LAWS

The MINISO Retail Partner model represents a mutually beneficial relationship between us and the MINISO Retail Partners, where we achieve rapid store network expansion with consistent brand image and consumer experience in an asset-light manner, and our MINISO Retail Partners attain attractive investment opportunities. … As of June 30, 2020, 488 of our MINISO Retail Partners had invested in MINISO stores for over 3 years.

(Emphasis added.)

32.     The Registration stated the following, in pertinent part, regarding the Company's planned use of IPO and other funds:

**USE OF PROCEEDS**

We estimate that we will receive net proceeds from this offering of approximately US$573.5 million, or approximately US$659.7 million if the underwriters exercise their over-allotment option in full, after deducting underwriting discounts and commissions and the estimated offering expenses payable by us.

… We plan to use the net proceeds of this offering to expand our business operations as follows:

• approximately 30% to expand our store network;
• approximately 30% to invest in our warehouse and logistics network;
• approximately 20% to invest in technologies and information systems; and
• the balance for general corporate purposes, which may include investing in sales and marketing activities, expanding and upgrading our office space and facilities by acquiring land to build an office building, funding working capital needs and potential strategic investments and acquisitions, although we have not identified any specific investments or acquisition opportunities at this time.

(Emphasis added.)

33.     The risk disclosures in the Registration Statement themselves were materially misleading because they failed to truly disclose the Company's risks, failed to describe the Company's true business model, and failed to describe the

11

Company's planned actions with regards to its funds and its imminent lowering of its franchise fees. Specifically, the Registration Statement, in pertinent part, stated that:

> *We primarily rely on our retail partners and distributors to expand our store network. If we are unable to expand our store network successfully, our business, results of operations would be adversely affected.*
> We plan to expand our store network both domestically and internationally and we primarily rely on our MINISO Retail Partners and local distributors to realize such expansion. However, we may not be able to expand our store network as we planned. The number and timing of the stores actually opened during any given period are subject to a number of risks and uncertainties. ***For example, we may not be able to identify MINISO Retail Partners and local distributors with sufficient resources and strong local ties to collaborate with us.*** If our MINISO Retail Partners and local distributors fail to operate MINISO stores successfully for whatever reasons, they may not be willing or able to renew their agreements with us. As a result, the number of MINISO stores in our store network will decrease, which would negatively affect our store expansion plan. …

> *If we, our MINISO Retail Partners or local distributors fail to successfully operate MINISO stores, our business and results of operations would be adversely affected.*
> ***As of June 30, 2020, over 90% of MINISO stores in our global network were established and operated by our MINISO Retail Partners and local distributors.*** Therefore, successful operations of MINISO stores by our MINISO Retail Partners and local distributors directly affect our results of operations. ***However, our MINISO Retail Partners and local distributors are independent from us and we cannot control many factors that impact the profitability of their MINISO stores.*** Despite the fact that we have direct access to key operational data from MINISO Retail Partner stores, which enable us to help our MINISO Retail Partners systematically customize merchandising down to the store level and coordinate inventory management on real-time basis, … The quality of MINISO store operations may be compromised if we fail to effectively monitor the operation of MINISO stores by our MINISO Retail Partners or local

distributors. …

In the past, we, our MINISO Retail Partners and local distributors shut down *a small number* of underperforming MINISO stores and may continue to do so in the future. …

*If our MINISO Retail Partners or local distributors do not satisfactorily fulfill their responsibilities and commitments, our brand image, results of operations could be materially harmed.*

Our products are sold to consumers through either our directly operated stores or through stores operated by our MINISO Retail Partners or local distributors. *As of June 30, 2020, over 90% of MINISO stores in our global network were established and operated by our MINISO Retail Partners and local distributors.* We typically enter into franchise agreements with our MINISO Retail Partners or master license agreements and product sales agreements with our local distributors. These agreements set out each party's responsibilities under different cooperation model. See "Business—Our Store Network" for more information on different types of store operation models. …

*If we fail to maintain the relationship with our MINISO Retail Partners or our local distributors or fail to attract new MINISO Retail Partners or local distributors to join our store network, our business, results of operations and financial condition could be materially and adversely affected.*

*As of June 30, 2020, over 90% of MINISO stores globally are operated by our MINISO Retail Partners and local distributors.* As a result, maintaining the relationship with and attracting new MINISO Retail Partners and local distributors to join our store network are critical to our business and results of operations. *However, we may not be able to maintain our relationship with MINISO Retail Partners and local distributors due to a number of factors, some of which are beyond our control.* For example, if our existing products or new products fail to attract consumers, our MINISO Retail Partners and local distributors may experience sales declines. As a result, they may not be able to generate investment returns as they expected, and thus choose not to renew their agreements with us. … *As a result, our MINISO Retail Partners and local distributors may terminate their agreements with us or choose not to renew such agreements with us.*

13

In addition, we may also be unable to continuously offer attractive terms or economic benefits to our MINISO Retail Partners or local distributors. As a result, our MINISO Retail Partners or local distributors may not be effectively motivated to sell more products or continue the cooperative relationships with us. If our MINISO Retail Partners or local distributors decide to shut down MINISO stores they opened, we will refund the corresponding deposit to them. … In addition, we may not be able to attract a sufficient number of new MINISO Retail Partners and local distributors to join our network and open MINISO stores, which will negatively affect our future business growth. The occurrence of any of the above could have a material and adverse effect on our expansion plans, business prospects, results of operations and financial condition.

\*       \*       \*

*If we are unable to manage our growth or execute our strategies effectively, our business and prospects may be materially and adversely affected.*

**Our business has continued to grow in recent years, and we expect continued growth in our business and revenues. We plan to further expand and upgrade our store network** both in China and globally and enhance our product development and supply chain capabilities. We face certain risks in executing these strategies and we cannot assure you that we will be able to execute our growth strategies successfully and realize our expected growth. For example, as we continue to expand our store network and increase our product offerings, we will need to work with a large number of new suppliers, MINISO Retail Partners and local distributors efficiently and establish and maintain mutually beneficial relationships with our existing and new suppliers, MINISO Retail Partners and local distributors. … If we are not able to manage our growth or execute our strategies effectively, our expansion may not be successful and our business and prospects may be materially and adversely affected. In addition, we may expand and upgrade our office space and facilities by acquiring land to build an office building, which may lead to increased capital expenditure and negatively affect the funds available for executing our growth strategies or for our business operations.

\*       \*       \*

*We have not determined a specific use for a portion of the net proceeds from this offering and we may use these proceeds in ways with which you may not agree.*

14

*We have not determined a specific use for a portion of the net proceeds of this offering*, and our management will have considerable discretion in deciding how to apply these proceeds. You will not have the opportunity to assess whether the proceeds are being used appropriately before you make your investment decision. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. Our management has discretion over the use of proceeds we receive from this offering, and we could spend the proceeds we receive from this offering in ways our ADS holders may not agree with or that do not yield a favorable return, or no return at all. Our actual use of these proceeds may differ substantially from our plans, if any, in the future. We cannot assure you that the net proceeds will be used in a manner that would improve our results of operations or increase the ADS price, nor that these net proceeds will be placed only in investments that generate income or appreciate in value.

(Emphasis added.)

34.     The statements contained in ¶¶ 31-34 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (1) Defendants and other undisclosed related parties owned and controlled a much larger amount of MINISO stores than previously stated; (2) as a result, MINISO concealed its true costs; (3) the Company did not represent its true business model; (4) Defendants, including the Company and its Chairman, engaged in planned unusual and unclear transactions; (5) as a result of at least one of these transactions, the Company is at risk of breaching contracts with PRC authorities; (6) the Company would imminently and drastically drop its franchise fees; and (7) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at

15

all relevant times.

35.   Then on July 26, 2022, during trading hours, market researcher Blue Orca Capital published a report on the Company (the "Report") which alleged several issues with the Company.

36.   The Report stated the following, in pertinent part, regarding the Company's business model, costs, and the amount of stores owned and controlled by Defendants (including the Company and Defendant Ye):

> ***Rather than operate an independent network of franchisees, our seven-month investigation of Chinese corporate records and store level data indicates, in our opinion, that hundreds of stores are secretly owned and operated by MINISO executives or individuals closely connected to the chairman.***
>
> \*      \*      \*
>
> **1. MINISO Lies about its Core Business Model.** ***MINISO's value proposition to investors is that it allegedly operates an asset-light, high-margin independent franchise model.*** Supposedly, this enables the Company to expand quickly while minimizing upfront capital costs. In theory, this also allows MINISO to generate high margins without the operating expenses and complexity which drag down profitability at traditional retailers. We think that this foundational narrative is a lie.
>
> **a. Hundreds of Stores Registered to MINISO Executives or Persons Connected to Chairman.** MINISO claims that 99% of its stores in China, its key market, are operated by franchisees independent from the Company. ***To vet this claim, over the course of seven months, we manually crosschecked MINISO and Top Toy stores in China with the Chinese corporate registry and online map and consumer data. Through our investigation, first begun in November 2021, we found over 620 supposedly independent franchises, which, according to Chinese corporate records, are registered under the names of MINISO executives or individuals closely connected to the Company's chairman.*** Rather than independent franchises, we believe that such evidence indicates that these stores are secretly owned and operated by the Company.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

**b. MINISO Admitted in Chinese Media that 40% of Stores Directly Owned.** Our due diligence is consistent with MINISO's disclosures before the Company began preparing for a U.S. listing. *At a 2017 conference in China, MINISO's brand director said in an interview that most MINISO stores in tier one cities in China are owned and operated by the Company, and that franchising is only limited to lower tier cities. In November 2019, another article published by Chinese state-owned media reported that 40% of MINISO stores were owned and operated by the Company.* This tracks with our investigation, and directly contradicts MINISO's disclosures to investors.

\*     \*     \*

… This evidence is also consistent with our investigation into MINISO store ownership which indicates that *contrary to the Company's claims, many MINISO stores are secretly owned by Company executives or insiders closely connected to the chairman*. This makes sense: if the brand is in decline, and the stores are struggling, then MINISO will struggle to attract franchisees. *In order to show store growth to investors, the Company likely has no choice but to secretly open and operate stores, given that franchisees no longer view them as an attractive opportunity.*

*Ultimately, we believe that there is overwhelming evidence that MINISO misleads the market about its core business.* Rather than operate an asset-light, high-margin franchise model, evidence indicates that hundreds of MINISO stores are owned and operated by Company executives or individuals closely connected to MINISO and its chairman. *Accordingly, we believe that MINISO is concealing the costs of such stores from investors.*

\*     \*     \*

**MINISO Lies about its Business Model**

… MINISO claims that as of March 31, 2022, 97% of its stores are operated by independent franchisees. *Under the franchise model, MINISO claims it can generate higher margins with lower cost and lower risk, as the franchisee bears not only the capital expenditures to build the store but also rental costs, labor costs and other operating expenses.*

17

In China, the percentage is even higher, with the Company claiming that 99% of MINISO stores are owned and operated by franchisees. MINISO claims that as of March 31, 2022, it directly owns and operates only 11 MINISO stores and 4 Top Toy stores. The remaining 3,274 stores in China are purportedly owned and operated by franchisees, which MINISO calls "retail partners." **MINISO explicitly tells investors that its retail partners are independent from the Company.**

[Image omitted.]

**To vet this claim, over the course of seven months, we manually crosschecked MINISO and Top Toy stores in China with the Chinese corporate registry and online map and consumer data.** ***Through our investigation, first begun in November 2021, we found at least 620 supposedly independent franchises, which, according to Chinese corporate records, are registered under the names of MINISO executives or individuals closely connected to the Company's chairman.*** Rather than independent franchises, we believe that such evidence indicates that these stores are owned and operated by the Company.

In the following graphic, we summarize the results of our findings, including the number of MINISO and Top Toy stores we believe are owned or operated by MINISO executives or insiders closely connected to the chairman or the Company.

[Image omitted.]

We have also included a column showing the deregistered connected entities and closed stores in the last 7 months. It is unclear whether such store closures are temporary due to Covid lockdowns or permanent, but they are nevertheless illustrative of *the broader trend as they are clearly registered to either MINISO executives or individuals closely connected to the chairman and the Company*.

• **10 MINISO Stores Owned by MINISO Senior VP and COO**

According to MINISO's IPO investor deck, Huang Zheng is MINISO's Vice President and Overseas Chief Operating Officer.

[Image omitted.]

Chinese corporate registries show that Huang Zheng is the registered owner of 10 MINISO stores, which we were able to confirm by matching entities owned by Huang from the Chinese corporate registry with the location of a MINISO store. …

MINISO claims that its franchisees are independent, yet Chinese corporate records, cross-checked with store level data, show that MINISO's vice president and chief operating officer of its overseas

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

business is the registered owner of at least 10 MINISO stores. Other examples abound.

**• 12 Stores Owned by MINISO Subsidiary Legal Representative**

Chinese corporate records state that Zhou Hongxia is the legal representative of MINISO's Shanghai subsidiary as well as multiple other MINISO branches.

[Image omitted.]



According to the Chinese corporate registry, as of November 2021, Zhou Hongxia owned 11 MINISO stores and 1 Top Toy store, which we were able to confirm by matching the address of the entities he owns on the Chinese corporate registry with the location of a MINISO or Top Toy shop. …

**• Registered owner of 15 stores is an executive of a MINISO subsidiary**

MINISO (Wuhan) Enterprise Management Consulting ("MINISO Wuhan") is a MINISO subsidiary. According to the Chinese corporate registry, MINISO Wuhan's supervisor is Ye Tao. Ye Tao not only shares the same surname with MINISO Chairman (Ye Guofu), but he is also the supervisor of multiple other companies owned and controlled by MINISO's chairman.

According to the Chinese corporate registry, Ye Tao is the owner of 15 MINISO stores. [Footnote omitted.]

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS



Source: qcc.com, *MINISO HK Prospectus*
*Ye Guofu owned 99% of 199 Global Holding (Guangzhou) until March 28, 2022*

As an executive of a MINISO's subsidiary and multiple Chairman-owned entities, Ye Tao appears far from an independent third party. Yet undisclosed to investors, this insider is the registered owner of 15 supposedly independent franchises.

**• 34 Stores Owned by Chairman's Legal Representative**

We have identified what we believe to be another undisclosed related party, Lin Zongyou. We summarized some of Lin Zongyou's many connections to MINISO below, including Chinese corporate records which indicate that he is the legal representative of almost a dozen entities owned (or recently owned) by MINISO's chairman, his wife or a MINISO executive director. [Footnote omitted.]

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Source: qcc.com

Similar to Ye Tao, Lin Zongyou is the registered owner of 34 MINISO stores. [Footnote omitted.]

• **Hundreds of Entities Share Overlapping Registration Information**

In another example, Li Minxin, MINISO's director and executive vice president, has a MINISO store registered under his name in the database as Shenzhen Longgang Miniso Store (the "LG Store"). We cross-checked the registered address of the store (深圳市龙岗区平湖街道凤凰社区守珍街 165 号) and confirmed that there was a MINISO store at this location. [Footnote omitted.] …

We also noticed that many of the MINISO stores owned by MINISO executives Li Minxin and Huang Zheng use the same registered phone number.

[Image omitted.]

Entities which share the same registered phone number typically are connected to each other, sharing overlapping control or common ownership. The Chinese corporate registry database shows that there are in total 556 entities sharing this phone number; among them, 291 entities are still in operation.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

[Image omitted.]

This led us to more undisclosed related parties of the Company that own a significant number of MINISO stores.

Things appear no different with respect to MINISO's new Top Toy brand, introduced by the Company in December 2020 catering to the top toy market. MINISO reported that as of March 2022, there are 92 Top Toy stores in China and only 4 are stores directly operated by the Company.

[Image omitted.]

Yet similar to MINISO stores, our due diligence indicates that 34 Top Toy stores, or 37% of all Top Toy stores, are secretly owned by related parties of the Company. [Footnote omitted.]

• **MINISO Admitted in Chinese Media that 40% of Stores Directly Owned**

*Notably, our findings are consistent with MINISO's disclosures before the Company began preparing for a U.S. listing. At a 2017 conference in China, MINISO's brand director said in an interview that most MINISO stores in Tier 1 cities in China are operated by the Company and that franchising is only limited to lower tier cities.*

[Image omitted.]

*In another article published in November 2019, Chinese media reported that 40% of MINISO stores are owned by the Company.*

[Image omitted.]

*The article is highly credible as it appeared in the financial news arm of the Shanghai Media Group, a state-owned enterprise. This November 2019 account in Chinese state-owned media stating that 40% of MINISO stores are owned and operated by the Company directly contradicts MINISO's disclosures to investors, in which the Company stated that less 1% of stores in China were directly operated by the Company in 2019.*

23

[Image omitted.]

We also spoke to a MINISO franchisee who had owned several MINISO stores since 2016. He confirmed to us that **MINISO had more than 1,000 company-owned stores in China in 2019**, although many stores have closed down because of Covid-19.

Before MINISO went public in the U.S., it told Chinese media that most MINISO stores in tier one cities were owned and operated by the Company. ***Our suspicion is that MINISO realized early in the pre-IPO process that a brick-and-mortar retailer would be far less attractive to investors than an asset-light franchise business, so we think that the Company simply lied about these stores.***

Yet these candid statements in Chinese media are consistent with our due diligence, which found hundreds of stores owned by Company insiders or those closely connected to the chairman. …

But based on the independent evidence, we think that this foundational narrative is a lie. ***We found at least 620 supposedly independent MINISO stores in China which are owned and operated by either MINISO executives or individuals closely connected to the chairman. We suspect that these stores are likely controlled and funded by the Company. This suggests that MINISO's real margins are likely significantly less than reported to investors.***

Fundamentally, this misrepresentation obscures MINISO's true business model, tricking the markets into applying an unjustified and unsustainable multiple on a mundane retail business model. MINISO is currently trading at 1.4x sales as an asset light and high margin business, a desirable proposition especially during Covid-19. Yet our due diligence shows that in reality, MINISO is more like a declining brick-and-mortar operator, and we think it should be valued as such.

(Emphasis added.)

37.   The Report stated the following, in pertinent part, regarding the Company's and Defendant Ye's unusual transactions and risks thereof:

24

*Chinese corporate filings also indicate, in our view, that the chairman siphoned hundreds of millions from the public company through opaque Caribbean jurisdictions as the middleman in a crooked headquarters deal.*

\*        \*        \*

**2. Money for Nothing: IPO Proceeds Siphoned by Chairman through Crooked Headquarters Deal.** *Shortly after going public, MINISO set up a BVI joint venture with its chairman to build a massive Chinese headquarters. Despite only holding a 20% interest in the JV, MINISO contributed all of the initial RMB 346 million deposit to purchase the land. Less than a year later, MINISO bought out the chairman's 80% interest in the JV.* In our opinion, this transaction is a *naked transfer of shareholder money to the chairman*, as Chinese government records indicate that the chairman likely never contributed any capital to the JV. *This means that when MINISO bought him out of his JV interest, it was effectively money for nothing.* It is also highly unusual for a Chinese company to purchase land in China through a BVI intermediary. *Why not purchase the land directly in China without routing the deal either through the chairman or through the BVI? Unless the point was to siphon investor cash to the chairman using an opaque Caribbean jurisdiction.*

\*        \*        \*

**Money for Nothing: IPO Proceeds Siphoned by Chairman through Crooked Headquarters Deal**

*MINISO listed on the New York Stock Exchange in October 2020. Shortly thereafter, we believe that MINISO's chairman, Ye Guofu, bilked hundreds of millions of freshly raised capital from public investors through a series of crooked transactions revolving around the purchase and construction of a massive headquarters in China.*

In December 2020, MINISO announced the formation of a BVI-based joint venture between the Company and Chairman Ye to build a new headquarters in China. According to the announcement, Chairman Ye held 80% of the JV through an entity solely owned by him [footnote omitted], and MINISO held the remaining 20%. Less than one year later, in October 2021, MINISO bought out the chairman's remaining 80% share for RMB 695 million.

25

1
2
3
4
5
6
7
8
9



Source: MINISO Public Filings, https://www.qcc.com/firm/237c0d23657dc0d32b5dc874d233a8e6.html

Right off the bat, this transaction appeared deeply suspicious. *If MINISO wanted to buy a new headquarters in China, why not buy the land directly? Why purchase the land through the chairman?* In our experience, the only reason for a Chinese company to route a land purchase through insiders is to siphon public company funds through the transaction.

Second, *if the land for the headquarters is in China, why would MINISO form an offshore JV in the BVI to purchase the land and develop the property?* To us, the explanation is obvious. The BVI is an extremely opaque jurisdiction which does not provide meaningful disclosures to auditors and investors. *The principal advantage of the BVI is that it easily facilitates opaque offshore transfer of cash to insiders.* Otherwise, why wouldn't a Chinese company just buy land in China through a Chinese entity?

*More importantly, it appears from Chinese corporate records that the chairman never put any money toward the purchase. He received the benefits, but MINISO put forward the cash.*

Initially, MINISO reported that while the Company had already contributed its portion of the required capital to the JV (RMB 356 million), *the chairman had yet to invest his portion of the cash to JV even though he owned 80% of the newly formed entity*. Although the chairman held 80% of the equity of the JV, it was only the Company

26

that contributed the cash to buy the land despite its minority stake in the BVI entity.

[Image omitted.]

***Chinese filings confirm that it was the Company, not the chairman, which put forth the cash for the land.*** In January 2021, the Chinese subsidiary of the JV, Mingyou Industrial Investment (Guangzhou) Co., Ltd ("Mingyou Industrial"), acquired land rights in Guangzhou at a value of RMB 1.73 billion through a public bidding process. According to local media, the bidding deposit was RMB 346 million, or 20% of the purchase price.

[Image omitted.]

The deposit for the land (RMB 346 million) matches almost exactly the amount initially MINISO contributed to the JV according to Chinese corporate records, indicating that it was the Company's cash, not the chairman's, that paid the deposit for the land.

There is evidence to suggest that the chairman, despite owning 80% of the JV, likely never contributed any cash to the entity. According to MINISO's Hong Kong prospectus, the Company bought out the chairman's 80% interest in the JV on October 27, 2021, for RMB 695 million.

[Image omitted.]

***According to corporate data publicly available in the National Enterprise Credit Information Publicity System, the paid-in capital of the JV's Chinese subsidiary remained at RMB 345.7 million (the initial deposit amount) until the day after MINISO acquired the chairman's 80% share.***

[Image omitted.]

***Chinese public records show that on October 28, 2021, one day after MINISO acquired the chairman's stake in the JV, the paid in capital increased to RMB 1.8 billion.*** To be clear, paid-in capital represents the actual amount of money that a company has received from

shareholders. Any change to the paid-in capital is registered with the local government and is generally indicative of whether and what extent shareholders have funded the entity.

[Image omitted.]

***MINISO admits in its public filings that it contributed the initial deposit to purchase the land in December 2020. Government records highlighted above show that no additional capital was contributed to the JV until after MINISO bought out the chairman in October 2021.*** To us, the corporate records clearly indicate that the chairman did not contribute money to the JV. ***That means that when MINISO paid him out for his JV interest, we think this was simply a naked transfer of shareholder wealth to the chairman. Money for nothing.***

[Image omitted.]

… We don't believe the chairman ever contributed any cash to the JV, as the paid-in capital increase took place only after MINISO purchased his 80% interest in the JV. To us, ***the transaction appears to be designed to simply siphon public money to the chairman.***

***This financial maneuvering also put MINISO at potential risk of breaching its contract with the Chinese government.*** The contract for the land purchase was published by the local government online and is accessible for anyone who wishes to check. **<u>The contract specifically prohibits the purchaser's change of ownership structure for 10 years.</u>**

[Image omitted.]

***MINISO risked breaching its contract with the Chinese government by routing the land purchase through opaque BVI entities to accommodate a series of related party transactions with its chairman.*** We believe that the only reason the Company undertook this risk was to permit the chairman to siphon hundreds of millions from the public company.

(Emphasis added.)

28

38.    The Report stated the following, in pertinent part, regarding the Company's imminent and drastic franchise fee decline:

**3. Retailer In Decline: Shrinking Revenues, Falling Franchise Fees and Store Closures**. Independent evidence, including archived disclosures on MINISO's Chinese website, reports in Chinese media and interviews with former employees, indicate that MINISO is a brand in serious peril. …

**c. Franchise Fees Dropped by 63%, Indicating Lagging Interest.** *Archived disclosures on MINISO's Chinese website indicate that MINISO lowered its franchising fee by 63% over the past two years in a desperate effort to attract franchisees.* This is a telltale sign that the business is substantially less attractive to retail partners than it used to be.

*      *      *

**c. Franchise Fees Dropped by 63%, Suggesting Lagging Interest**

***Franchise fees are a cornerstone of MINISO's value proposition and are 100% margin revenue.*** Yet archived disclosures on MINISO's Chinese website, discovered through the Wayback Machine, indicates that the Company dropped franchise fees by 63% over the last two year.

According to archived disclosures on MINISO official Chinese website, ***each potential MINISO franchisee needs to pay a fixed deposit and an annual franchising fee***. As of December 2, 2020, the franchising fee advertised to potential franchisees in China was RMB 80,000 per year and required a product deposit of RMB 750,000.



*Source: https://web.archive.org/web/20201202064303/https://www.miniso.cn/Shop/Stroe*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Yet beginning in 2021, MINISO slashed franchising fee from RMB 80,000 per year to RMB 50,000 per year. The product deposit was also reduced from RMB 750,000 to RMB 600,000.



*Source:* https://web.archive.org/web/20210125011406/https://miniso.cn/Shop/Stroe

***In 2022, MINISO's website shows that the franchising fee is further reduced to RMB 29,800 per year for city-level stores, 63% down from two years ago. [Footnote omitted.] The product deposit is also reduced to RMB 350,000.***



*Source:* MINISO Website, January 2022

*Source:* MINISO Website

We believe this drastic franchise fee reduction signals the declining brand value of MINISO to both its customers and franchisees. Further, it erodes the financial health of MINISO moving forward. ***From the franchise fee drop alone, the Company faces an annual loss of RMB 159 million in revenue and profit at the current franchise-owned store count of 3,169.***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

| RMB | Pre-2021 | 2021 | 2022 | $ Change | % Change |
|---|---|---|---|---|---|
| Franchising Fee | 80,000 | 50,000 | 29,800 | (50,200) | -63% |
| # of MINISO franchise-owned stores | | | | 3,169 | |
| Est. Loss on Revenue and Profit (RMB M) | | | | (159) | |

*Source: MINISO Public Filings, MINISO Website*

This undercuts MINISO's claims of a thriving brand and a growing business. Rather, such independent evidence indicates that ***MINISO is a brand and business in decline***, with falling revenues, ***large scale store closures and falling franchise fees***.

(Emphasis added.)

39.    On this news, MINISO's ADS price fell $1.08 per ADS, or 14.98%, to close at $6.13 per ADS on July 26, 2021, on unusually heavy trading volume.

40.    Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, MINISO's ADS price has fallen significantly below its IPO price, damaging Plaintiff and Class members. As of July 27, 2022, MINISO's ADSs closed at $5.66 per ADS, representing more than a 70% decline from the $20.00 IPO price.

41.    Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

42.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

43.     Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violations of Section 11 of the Securities Act**

**<u>Against All Defendants</u>**

49.     Plaintiff incorporates all the foregoing by reference.

50.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

51.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

52.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

53.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

54.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

33

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

55.    Plaintiff acquired the Company's securities pursuant to the Registration Statement.

56.    At the time of their purchases of MINISO securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

57.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act

### Against All Defendants

58.    Plaintiff incorporates all the foregoing by reference.

59.    By means of the defective Prospectus, Defendants promoted, solicited, and sold MINISO securities to Plaintiff and other members of the Class.

60.    The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

61. Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired MINISO securities.

62. By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased MINISO securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

63. This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Company and the Individual Defendants

64. Plaintiff incorporates all the foregoing by reference.

65. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

66. The Individual Defendants were controlling persons of MINISO by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the

Company. The Company controlled the Individual Defendants and all of MINISO employees.

67. The Company and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

68. This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

1

Dated: August 17, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

37